# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA

Civil Action No. 1:18-cv-00060

United States of America,

       Plaintiff,

   v.

XTO Energy Inc.

       Defendant.

---

## CONSENT DECREE

---

# TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ............................................................................................ 3
II.     APPLICABILITY .............................................................................................................. 3
III.    DEFINITIONS ................................................................................................................... 4
IV.     INJUNCTIVE RELIEF .................................................................................................... 10
V.      ENVIRONMENTAL MITIGATION PROJECT ............................................................. 26
VI.     CIVIL PENALTY ............................................................................................................ 28
VII.    PERIODIC REPORTING ................................................................................................ 29
VIII.   STIPULATED PENALTIES ........................................................................................... 32
IX.     FORCE MAJEURE .......................................................................................................... 37
X.      DISPUTE RESOLUTION ............................................................................................... 39
XI.     INFORMATION COLLECTION AND RETENTION .................................................... 41
XII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ......................................... 44
XIII.   COSTS ............................................................................................................................. 47
XIV.    NOTICES ......................................................................................................................... 48
XV.     SALES OR TRANSFERS OF OPERATIONS ................................................................ 49
XVI.    EFFECTIVE DATE .......................................................................................................... 52
XVII.   RETENTION OF JURISDICTION .................................................................................. 52
XVIII.  MODIFICATION ............................................................................................................. 52
XIX.    TERMINATION ............................................................................................................... 53
XX.     PUBLIC PARTICIPATION ............................................................................................. 55
XXI.    SIGNATORIES/SERVICE .............................................................................................. 55
XXII.   INTEGRATION/HEADINGS .......................................................................................... 56
XXIII.  SECTION 162(F)(2)(A)(II) IDENTIFICATION .............................................................. 56
XXIV.   FINAL JUDGMENT ........................................................................................................ 56
XXV.    APPENDICES .................................................................................................................. 57

WHEREAS, the United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), is filing a Complaint concurrently with the lodging of this Consent Decree, pursuant to Section 113(b) of the Clean Air Act ("Act"), 42 U.S.C. § 7413(b). The Complaint alleges that Defendant, XTO Energy Inc. ("XTO"), violated requirements of the Act and the Federal Implementation Plan ("FIP") for Oil and Natural Gas Well Production Facilities, 40 C.F.R. Part 49, Subpart K at Well Pads located on the Fort Berthold Indian Reservation ("FBIR") that are part of XTO's oil and natural gas production system in the Williston Basin in North Dakota;

WHEREAS, Storage Tanks located on Well Pads store Produced Oil (i.e., hydrocarbon liquids) and Produced Water (i.e., water with residual hydrocarbon liquid impurities) until the liquids can be transported by pipelines or tanker trucks to downstream processing operations for sale, reuse, or disposal. Produced Oil and Produced Water are separated from natural gas near the well-head in a device known as a "Separator" or "Heater-Treater." After separation in the Separator or Heater-Treater, the Produced Oil and Produced Water, also known as "Pressurized Liquids," are emptied into Storage Tanks kept at or near atmospheric pressure. As Pressurized Liquids are transferred into Storage Tanks, the pressure of the fluids decreases and vapors, which include volatile organic compounds ("VOCs"), are released or "flashed" into a gaseous state. Such vapors are known as "flash gas."  Additional vapors are released from the Produced Oil and Produced Water due to temperature fluctuations and liquid level changes. These are known as "working," "breathing," and "standing" losses;

WHEREAS, Well Pads are equipped with systems to route vapors from the Produced Oil and Produced Water Storage Tanks by vent lines to emission control devices;

WHEREAS, Well Pads located on the FBIR are subject to the FBIR FIP, including the

requirement to "operate and maintain all liquid and gas collection, storage, processing and handling operations, regardless of size, so as to minimize leakage of natural gas emissions to the atmosphere" (40 C.F.R. § 49.4164(a));

WHEREAS, the Tank Systems subject to this Consent Decree operate in a steady state or near steady state;

WHEREAS, the Complaint alleges that in 2014 and 2015, inspectors from EPA inspected 11 of XTO's Well Pads located on the FBIR and using an optical gas imaging infrared camera observed that certain Storage Tanks located at those Well Pads were emitting VOCs to the atmosphere at the time of the inspection;

WHEREAS, in response to a July 2015 request for information by the EPA pursuant to Section 114 of the Act, 42 U.S.C. § 7414, XTO provided data to EPA regarding certain Well Pads. This data included detailed analyses of samples of Pressurized Liquids and associated production data, as well as detailed information about the Vapor Control Systems at those Well Pads. Based upon an evaluation of this data, the United States further alleges in the Complaint that a number of the Storage Tanks at XTO's Well Pads were equipped with Vapor Control Systems that did not have sufficient capacity to route all the vapors from the Storage Tanks to control devices without first building pressure in the Storage Tanks that exceeds the set point of the pressure relief devices ("PRDs"), which in XTO's Vapor Control Systems are thief hatches, such that vapors would have been emitted through the PRDs directly to the atmosphere without any combustion;

WHEREAS, XTO does not admit to the allegations in the Complaint nor does it admit any liability arising out of the transactions or occurrences alleged in the Complaint; and

WHEREAS, the United States and XTO (the "Parties") recognize, and the Court by

2

entering this Decree finds, that this Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties and that this Decree is fair, reasonable, and in the public interest;

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue), and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.    JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action and the Parties pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 113(b) of the Act, 42 U.S.C. § 7413(b). Venue is proper in this judicial district pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because the violations alleged in the Complaint are alleged to have occurred in, and XTO conducts business in, this judicial district. XTO consents to and shall not challenge entry of this Consent Decree or this Court's jurisdiction to enter and enforce this Decree, and XTO further consents to venue in this judicial district. Except as expressly provided for herein, this Decree shall not create any rights in or obligations of any party other than the Parties to this Decree. Except as provided in Section XX (Public Participation) of this Decree, the Parties consent to the entry of this Decree without further notice.

## II.    APPLICABILITY

2.     The obligations of this Consent Decree apply to and are binding upon the United States, and upon XTO and any successors, assigns, or other entities or persons otherwise bound by law, consistent with the Sales and Transfer Provisions in Section XV. Unless otherwise noted,

the obligations of this Decree shall become enforceable on its Effective Date as provided in

Section XVI (Effective Date).

3.       XTO shall: (1) provide a copy of this Consent Decree to its President, Vice

Presidents, General Counsel, Environmental Manager, and other managers or field supervisors

who will be responsible for implementing the terms of this Consent Decree, and shall ensure that

any employees and contractors whose duties might reasonably include compliance with any

provision of this Consent Decree are made aware of this Consent Decree and specifically aware

of the requirements of this Consent Decree that fall within such person's duties; and (2) place an

electronic version of the Consent Decree on its internal environmental sharepoint site. XTO shall

be responsible for ensuring that all employees and contractors involved in performing any work

pursuant to this Consent Decree perform such work in compliance with the requirements of this

Consent Decree.

4.       In any action to enforce this Consent Decree, XTO shall not raise as a defense to

liability or a stipulated penalty the failure by any of its officers, directors, employees, agents, or

contractors to take any actions necessary to comply with the provisions of this Decree. This

section does not preclude XTO from holding any employee, agent, or contractor of any tier who

is alleged to have not complied with this Consent Decree liable for their actions.

### III.    DEFINITIONS

5.       For purposes of this Consent Decree, every term expressly defined by this Section

shall have the meaning given that term herein. Every other term used in this Consent Decree that

is also defined in the Act, 42 U.S.C. § 7401 et seq., or in regulations promulgated pursuant to the

Act, shall mean in this Consent Decree what such term means under the Act or those regulations.

a.       "Active Use" – A Tank System is in Active Use if it is connected to one or

more Active Wells. For a Tank System to be deemed "not in Active Use" under this Consent Decree, it must not be reasonably capable of receiving production from any Active Wells.

b.      "Active Well" shall mean a well in which the completion interval is capable of producing hydrocarbons through the wellhead and where the well is currently in operation or may be restored to operation by opening valves or by energizing equipment involved in operating the well.

c.      "AVO" shall mean Audio, Visual, Olfactory.

d.      "Business Day" shall mean Monday through Friday, with the exception of federal holidays.

e.      "Calendar Day" shall mean any of the seven days of the week. In computing any period of time under this Consent Decree expressed in Calendar Days (as opposed to Business Days), where the last Calendar Day would fall on a Saturday, Sunday, or federal holiday, the period shall not be extended to the next Business Day.

f.      "Complaint" shall mean the complaint filed by the United States in this action.

g.      "Consent Decree" or "Decree" shall mean this Consent Decree and all appendices attached hereto listed in Section XXV (Appendices).

h.      "Date of Lodging" shall mean the date this Decree is filed for lodging with the Clerk of the Court for the United States District Court for the District of North Dakota.

i.      "Day" or "day" shall mean a Calendar Day unless expressly stated to be a Business Day. In computing any period of time under this Decree, where the last day

would fall on a Saturday, Sunday, or federal holiday, unless the time period is expressly stated to be in "Calendar Days" and not "days" or "Business Days," the period shall run until 11:59 p.m. Central Time of the next Business Day.

j.       "Defendant" or "XTO" shall mean XTO Energy Inc.

k.       "Effective Date" shall have the definition provided in Section XVI (Effective Date).

l.       "Emission Factor" shall mean the Tank Vapor Emission Factor developed by XTO pursuant to Paragraph 6 (Development of a Tank Vapor Emission Factor).

m.       "Environmental Mitigation Project" shall mean the requirements specified in Section V and Appendix B of this Consent Decree to remedy, reduce, or offset past excess ozone precursor emissions resulting from XTO's alleged violations of the Clean Air Act in this matter. Ozone is not emitted directly from air pollution sources but rather it is a photochemical oxidant formed when certain chemicals – VOCs and NOx – in the ambient air react in the presence of sunlight.

n.       "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

o.       "Heater-Treater" shall mean a unit that heats the reservoir fluid to break oil/water emulsions and to reduce the oil viscosity. The water is then typically removed by using gravity to allow the water to separate from the oil.

p.       "IR Camera Inspection" shall mean an inspection of a Vapor Control System using an optical gas imaging infrared camera designed for and capable of detecting hydrocarbon and VOC emissions, conducted by trained personnel who maintain proficiency through regular use of the optical gas imaging infrared camera.

6

q.      "Malfunction" shall mean any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not malfunctions

r.      "MHA Nation" shall mean the Mandan, Hidatsa and Arikara Nation, also known as the Three Affiliated Tribes, a federally-recognized Indian Tribe.

s.      "Normal Operations" shall mean all periods of operation, excluding Malfunctions. For Storage Tanks at Well Pads, Normal Operations includes, but is not limited to, liquid dumps from Separator(s) or Heater-Treater(s).

t.      "Operator" shall mean the principal on the bond covering a well, who is responsible for drilling, completion, and operation of the well, including plugging and reclamation of the well site.

u.      "Paragraph" shall mean a portion of this Decree identified by an Arabic numeral.

v.      "Parties" shall mean the United States and XTO.

w.      "Plaintiff" shall mean the United States.

x.      "Pressurized Liquids" shall mean pressurized Produced Oil upstream of the Storage Tank(s) or pressurized Produced Water upstream of the Storage Tank(s).

y.      "Produced Oil" shall mean oil that is separated from extracted reservoir fluids during Production Operations.

z.      "Produced Water" shall mean water that is separated from extracted reservoir fluids during Production Operations.

aa.      "Production Operations" shall mean the extraction, separation using

7

Separators and/or Heater-Treaters, and temporary storage of reservoir fluids from an oil and natural gas well at a Well Pad.

      bb.    "psi" shall mean pounds per square inch.

      cc.    "QA/QC" shall mean quality assurance and quality control.

      dd.    "Reliable Information" shall mean any observance or detection of VOC emissions: 1) from a Storage Tank opening (i.e., PRD/thief hatch), except during gauging or maintenance; or 2) from a combustion device used in a Vapor Control System without flame presence indicating combustion. Reliable Information must be observed or detected: 1) using an optical gas imaging infrared camera, EPA Method 21 monitoring, or AVO inspection; and 2) by EPA, XTO employees, or XTO contractors trained to conduct inspections for emissions. For purposes of this Decree only, evidence of staining alone shall not be considered Reliable Information. As to combustion devices used in a Vapor Control System, Reliable Information shall also include any observance or detection of no pilot light present by EPA, XTO employees, or XTO contractors. Observations from a Tank System while all wells associated with that Tank System are temporarily shut-in, and during which working and standing emissions may occur, will not be considered Reliable Information.

      ee.    "Section" shall mean a portion of this Decree identified by a Roman numeral.

      ff.    "Separator" shall mean a pressurized vessel designed to separate reservoir fluids into their constituent components of oil, natural gas, and water.

      gg.    "Storage Tank" shall mean a unit that is constructed primarily of non-earthen materials (such as steel, fiberglass, or plastic) which provides structural support

8

and is designed to contain an accumulation of produced reservoir fluids (i.e., Produced Oil or Produced Water). A liquid knockout vessel or similar device is not considered a Storage Tank.

hh.     "Tank System" shall mean one or more Storage Tanks, with at least one Produced Oil Storage Tank, that share a common Vapor Control System. The "Tank Systems" that are subject to this Consent Decree are listed in Column one of Appendix A, which lists all Tank Systems on Well Pads operated by XTO on the FBIR as of the Date of Lodging.

ii.     A "Tank System Group" shall mean Tank Systems with similar characteristics that can be subject to the same Tank Vapor Emission Factor developed pursuant to Paragraph 6.

jj.     "TPY" shall mean tons per year.

kk.     "United States" shall mean the United States of America, acting on behalf of EPA.

ll.     "Vapor Control System" or "VCS" shall mean the system used to contain, convey, and control vapors from one or more Storage Tank(s) (including flashing, working, breathing, and standing losses), as well as any natural gas carry-through to Storage Tanks. A Vapor Control System includes a Tank System, piping to convey vapors from a Tank System to a combustion device and/or vapor recovery unit, fittings, connectors, liquid knockout vessels or vapor control piping, openings on Storage Tanks (such as thief hatches and any other pressure relief devices ("PRDs")), and emission control devices.

mm.     "Visible Smoke Emissions" shall mean visible smoke that is observed for

9

more than one minute in any 15 minute period. In the event that visible smoke is observed during operation of any emissions control device by EPA, an XTO employee, or an XTO contractor trained to conduct inspections for emissions, EPA, XTO or its contractor shall use EPA Reference Method 22 of 40 C.F.R. Part 60, Appendix A, to determine whether Visible Smoke Emissions are present. The observation period shall be 15 minutes or until smoke is observed for one minute, whichever occurs first.

nn.    "VOC" or "VOCs" shall mean volatile organic compounds as defined in 40 C.F.R. § 60.2.

oo.    "Well Pad" shall mean a property with one or more Storage Tank(s) capable of receiving Produced Oil from Production Operations. The Well Pads that are subject to this Decree are identified in column two of Appendix A.

## IV.   INJUNCTIVE RELIEF

6.    <u>Development of a Tank Vapor Emission Factor</u>. XTO shall develop a conservative Tank Vapor Emission Factor ("Emission Factor") for each Tank System or Tank System Group, as XTO may determine appropriate. These Emission Factor(s) shall (i) reflect the maximum potential rate of vapors routed to a Vapor Control System during Normal Operations, including flashing, working, and breathing losses, (ii) include an appropriate engineering safety factor, and (iii) be expressed in standard cubic feet per barrel of oil produced.

a.    In developing these Emission Factor(s), XTO shall:

(1)    Include the maximum potential flash emissions associated with liquid flow to the Storage Tank(s) during Normal Operations and conditions to which the Vapor Control System is certified for operation in accordance with Paragraph 9 (Vapor Control System

10

Initial Verification), including where relevant:

  (a)  Maximum operating pressure and minimum temperature from the last stage of separation prior to the Storage Tank(s);

  (b)  Maximum potential stock tank liquid temperature;

  (c)  Composition and properties of the hydrocarbon liquids that reflects the highest potential for flash gas emissions (including consideration of the variability of such parameters and resulting impact on the solution gas content of the hydrocarbon liquids at a given pressure); and

  (d)  The recycling of liquids from the Storage Tank(s) back to the upstream process equipment.

 (2)  Include working and breathing losses at the maximum potential stock tank liquid temperature;

 (3)  Consider potential uncertainty of the input data and results (e.g., validity of empirical correlations, accuracy and representativeness of samples, process conditions); and

 (4)  Document all inputs, assumptions, calculation methods and simulation tools used to determine the Emission Factor.

b.  XTO submitted Emission Factor(s) and the calculations supporting those Emission Factors to EPA for its review and comment on October 4, 2017. EPA reviewed and provided comments to XTO on those Emission Factors on November 8, 2017. XTO may periodically update these Emission Factors as appropriate.

7.   <u>Calculating VCS Capacity</u>. XTO shall calculate the capacity of each Vapor Control System at a Well Pad, in standard cubic feet per day.

a.   As part of calculating the capacity of each Vapor Control System, XTO shall address, as appropriate:

(1)   Vapor control equipment installed on the Tank System including equipment-specific considerations and any associated pressure losses (e.g., liquid knock-out drums, flame arrestors);

(2)   Size and design of the piping system between the Storage Tank(s) and the emissions control device, and the size and design of the emissions control device (including consideration of equivalent pipe length of fittings and back pressure valves or other restrictions on vapor flow);

(3)   Any other potential vapor sources (e.g., transfer and loading systems, blanket gas, purge gas, pneumatic devices) tied or to be tied into the Vapor Control System not included in the Emission Factor(s);

(4)   Volume and duration of individual dump events, including the nature of the flow of liquids to the Separator or Heater-Treater (i.e., steady flow, slug flow, intermittent flow (e.g., due to discrete well cycling events)); the minimum time between dump events; and the maximum number of dump events associated with a single well cycle with slug or intermittent flow, including where relevant:

(a)   The type of dump valve control (e.g., proportional, on/off)

12

and dump valve size and trim size;

(b)     Size, length and fittings of the liquid transfer line between

the last stage of separation and the Storage Tank(s);

(c)     Consideration of simultaneous dump events to the same

Tank System (unless all potential simultaneous

events have been precluded through installation of timers,

automation, or other measures);

(d)     Consideration of the maximum design daily oil and water

production rates and diurnal variations in these flows;

(5)     Minimum available headspace in the Storage Tank(s);

(6)     Other design issues associated with the Vapor Control System

(e.g., fouling, potential for liquids accumulation in lines, and

winter operations); and

(7)     If transient modeling is used, the duration and maximum frequency

of successive dump events;

b.     XTO may rely on manufacturer specifications for individual components

or pieces of equipment that are part of a Vapor Control System.

c.     XTO shall calculate the capacity of each Vapor Control System at a Well

Pad in sufficient time for XTO to complete the engineering evaluations within 60 days

from the Effective Date.

8.     <u>Vapor Control System Field Survey, Engineering Evaluation, and Modification.</u>

a.     For each Tank System, XTO shall assess the Vapor Control System

through a field survey or other appropriate means. As part of this assessment, XTO shall

13

evaluate the condition of all PRDs/thief hatches, mountings, and gaskets at each Storage Tank within a Tank System, and the need for repair or replacement or the possibility of upgrading such equipment to reduce the likelihood of VOC emissions. This evaluation shall include the following actions:

> (1)     XTO shall ensure that every thief hatch is mounted with a suitable gasket to the Storage Tank in order to prevent VOC emissions, at the time of the survey, at the attachment point to the Storage Tank;

> (2)     If while evaluating the PRDs/thief hatches, mountings, and gaskets, XTO observes evidence of VOC emissions, except during gauging or maintenance, attributable to such PRDs/thief hatches, mountings, or gaskets, XTO shall repair, replace, or upgrade such equipment, as appropriate; and

> (3)     XTO shall maintain records of the following information:

>> (a)     The date each Tank System underwent this evaluation;

>> (b)     The name of the employee who performed the evaluation;

>> (c)     Whether evidence of VOC emissions attributable to PRDs/thief hatches, mountings, or gaskets was observed; and

>> (d)     What, if any, repair, replacement, or upgrade was performed, including a description of the existing PRD/thief hatch, mounting, or gasket, and a description of how that equipment was repaired or with what it was replaced/upgraded. Descriptions of PRDs/thief hatches shall include pressure set points where such information is

14

available, and descriptions of PRDs/thief hatches,

mountings, or gaskets shall include the manufacturer and

model where such information is available.

b.    Engineering Evaluation. XTO shall calculate the maximum allowable

daily oil production for each Tank System using the following equation ("Engineering

Evaluation"):

VCS Capacity/EF = max allowable production

Where:

VCS capacity = capacity of the Vapor Control System in standard cubic feet per

day, as determined pursuant to Paragraph 7 (Calculating VCS Capacity);

EF = maximum potential rate of vapors routed to the Vapor Control System

during Normal Operations in standard cubic feet per barrel, as determined

pursuant to Paragraph 6 (Development of a Tank Vapor Emission Rate); and

Max allowable production = the maximum oil production in barrels per day at the

Tank System.

An Engineering Evaluation is not required for a Vapor Control System at a Tank System

that is not in Active Use, that remains not in Active Use, and that is associated only with

wells that are plugged and abandoned before the termination of this Consent Decree.

c.    Vapor Control System Modification/Corrective Action. XTO shall ensure

that actual production at a Tank System during Normal Operations does not exceed the

maximum allowable production for that Tank System, as determined in Paragraph 8.b.

Nothing herein shall prevent XTO from making any necessary modifications to the Vapor

Control System to ensure that capacity is consistent with current oil production rates for

15

that Tank System.

d.      XTO shall complete all requirements of subparagraphs 8.a through 8.c for each Tank System by no later than 60 days after the Effective Date.

e.      If XTO has not completed an Engineering Evaluation (subparagraph 8.b) and any required modifications (subparagraph 8.c) for a Tank System within 60 days from the Effective Date, XTO shall shut-in all Production Operations associated with that Tank System by such deadline until the requirements of subparagraphs 8.b and 8.c have been completed.

f.      In the event that Production Operations are temporarily shut-in, XTO shall for the sole purpose of (i) undertaking an Engineering Evaluation at a Tank System, or (ii) taking corrective actions pursuant to Paragraph 12 (Reliable Information, Investigation, and Corrective Action) be allowed to resume Production Operations associated with that Tank System for a period not to exceed five Calendar Days. In the event that XTO requires more than five Calendar Days of resumed Production Operations to accomplish one of the purposes identified in this subparagraph, XTO may continue resumed Production Operations associated with that Tank System for up to an additional 10 Calendar Days provided that XTO documents the reason and duration for continued Production Operations and submits that documentation as part of the next Semi-Annual Report that is due at least 30 days after the cessation of resumed Production Operations.

9.      Vapor Control System Initial Verification. XTO shall complete the requirements of this Paragraph for each Tank System in accordance with the following schedule: (i) for all Tank Systems by no later than 120 days after the Effective Date, except Tank Systems for which associated Production Operations were temporarily shut-in pursuant to subparagraph 8.e; and (ii)

for any Tank Systems for which associated Production Operations were temporarily shut-in pursuant to subparagraph 8.e, by no later than 60 days after associated Production Operations are resumed:

      a.      Conduct an IR Camera Inspection of all Tank System openings (i.e., PRDs/thief hatches) during Normal Operations, including while Produced Oil is being sent to the Tank System from all associated Production Operations that are not shut-in at the time of the IR Camera Inspection, to confirm the Vapor Control System is adequately designed and sized and not emitting VOC. In the event that any associated Production Operations are shut-in at the time of this IR Camera Inspection, XTO shall perform additional IR Camera Inspection(s) in accordance with this subparagraph within 30 days of resuming any associated Production Operations (e.g., if three wells produce into a Tank System and two are shut-in at the time of the first IR Camera Inspection performed for this subparagraph, XTO must conduct additional IR Camera Inspections under this subparagraph within 30 days of resuming Production Operations from each of the two wells that were shut-in, unless Production Operations from those two wells are resumed on dates such that XTO can conduct a single, second IR Camera Inspection under this subparagraph that would be within 30 days of the date Production Operations were resumed for each well). Inspections under this subparagraph must be conducted pursuant to a written standard operating procedure prepared by XTO and approved by EPA. A video record of each IR Camera Inspection done to comply with this subparagraph shall be recorded and kept on file.

      b.      XTO shall comply with the requirements of Paragraph 12 (Reliable Information, Investigation, and Corrective Action) in the event VOC emissions are

observed during an IR Camera Inspection from a Tank System opening.

        c.      XTO shall complete and submit to EPA a Certification of Completion

Report that documents in a spreadsheet or database format: (i) the design capacity of each

Vapor Control System in standard cubic feet per day; (ii) the Emission Factor (which

could be for an individual Tank System or Tank System Group) that was used to

determine maximum allowable production for each Vapor Control System, including all

inputs used and assumptions made in developing the Emission Factor; (iii) the calculated

maximum allowable oil production in barrels per day; (iv) if applicable, the date

associated Production Operations were temporarily shut-in pursuant to subparagraph 8.e;

(v) if applicable, the date associated Production Operations temporarily shut-in pursuant

to subparagraph 8.e were resumed; (vi) the date each IR Camera Inspection was

completed pursuant to subparagraph 9.a and the results of such inspection(s); and (vii) a

list of any associated wells that were shut-in at the time of the IR Camera Inspection(s). If

a Tank System had any associated Production Operations shut-in at the time of the

subparagraph 9.a IR Camera Inspection, upon resuming any such Production Operations,

XTO shall update the Certification of Completion Report for that Tank System as part of

the next Semi-Annual Report that follows at least 60 days after such Production

Operations were resumed so as to update the information in items (iv) and (v).

    10.     <u>Post-Certification of Completion Modifications.</u>  If, after XTO has submitted to

EPA a Certification of Completion Report for a Tank System:

        a.      XTO determines that a specific Vapor Control System needs to be

modified to address Reliable Information or otherwise comply with the law, XTO shall

evaluate whether similar modifications are necessary at other similar Vapor Control

18

Systems using the same Emission Factor; or

> b.      XTO makes any changes to a Vapor Control System that could decrease its capacity, XTO shall recalculate the capacity of that Vapor Control System and the maximum allowable production in accordance with Paragraph 8.b (Engineering Evaluation).

XTO shall submit in the next required Semi-Annual Report: (i) a summary of any evaluations of whether modifications were necessary at other Vapor Control Systems, (ii) the timing, results, locations, and description of any modifications of other Vapor Control Systems or a timeline for the completion of such modifications, and (iii) the recalculated capacity and maximum allowable production of any Vapor Control Systems that were changed.

> 11.      Directed Inspection and Preventative Maintenance Program. XTO shall develop and submit for review and approval by EPA a directed inspection and preventative maintenance ("DI/PM") program by the Effective Date. XTO shall implement the DI/PM program as approved by EPA at each Tank System, and associated Well Pad, by no later than 120 days after the Effective Date. XTO is not required to implement the requirements of this Paragraph at a Well Pad where all Tank Systems are not in Active Use and remain not in Active Use, so long as XTO, upon returning one or more Tank System(s) to Active Use, performs the actions specified in subparagraphs 11.a and 11.b at the Well Pad within seven days and performs the actions specified in subparagraph 11.e at the Well Pad within 30 days. Subparagraphs 11.a and 11.b shall be implemented weekly; subparagraph 11.e shall be implemented monthly. The DI/PM program shall:

> a.      Address system-wide inspection, response, and preventative maintenance procedures for the Vapor Control Systems, including:

(1)      AVO walk-around inspection of all Tank Systems to check for

VOC emissions (including while Storage Tank(s) are receiving Produced Oil from

Production Operations), including checking for hissing, new stains, or other

indicators of operational abnormalities. The AVO walk-around inspection shall

also check the following parameters, where relevant, on the following equipment:

(a)      Well – presence of choke and surface flowing pressure.

(b)      Separators and Heater-Treaters – final stage of separation

maximum operating pressure and minimum temperature,

set point of any device restricting final stage Separator or

Heater-Treater dump flow rate, and valves in correct

position.

(c)      Tank System – PRDs/thief hatches (including that thief

hatches are closed and latched), tank valve/load line/drain

valve leaks, and seals.

(d)      Vapor Control System – combustion device checks that

burner is operational, no Visible Smoke Emissions, and

presence of a pilot light, liquid knockout drained as

necessary, inlet valves functioning properly, and auto-

ignitor in good working condition.

b.      Address any parameters or practices relied upon in developing the

Emission Factor for the Tank System or Vapor Control System Capacity by ensuring that

such parameters or practices (e.g. production rate, temperatures, pressures, etc.) are

identified on location and verified during the weekly inspection required by this

20

Paragraph.

c.      Establish and implement requirements for appropriate documentation of
compliance with DI/PM practices and procedures so that the Parties can verify that the
DI/PM program is being implemented.

d.      Establish and implement procedures for evaluation of performance of
wear equipment to identify appropriate long-term maintenance, inspection, and
replacement schedules (e.g., replacement of "wear" equipment).

e.      Periodic IR Camera Inspections. XTO shall undertake an IR Camera
Inspection program of all Tank Systems (including thief hatches and other pressure relief
devices), associated combustion devices, and associated open-ended lines (*e.g.*, vent
lines, blowdown valves or lines), in accordance with the following requirements:

(1)      IR Camera Inspections shall be performed on a monthly basis.
XTO shall notify the MHA Nation at least 24-hours in advance of an IR Camera
Inspection done pursuant to this Paragraph(e) and representatives of the MHA
Nation may observe any such inspection. Notice to the MHA Nation shall include
the date, time, and NDIC number(s) of the Tank System(s) to be inspected. Notice
shall be made to the MHA Energy Division Compliance Department by email to
salbeston@mhanation.com and klyson@mhanation.com and the MHA
Environmental Division of the Natural Resources Department by email to
edmundbaker@mhanation.com and to the Tribal Science Advisor at
lhlonefight@mhanation.com. The MHA Nation may change the individuals to
receive notice on its behalf by providing written notice to XTO of such change in
accordance with Section XIV (Notices). Verification of the MHA Nation's

21

attendance or absence at an inspection is not required for XTO to perform the inspection. These inspections must be conducted pursuant to a written standard operating procedure prepared by XTO and approved by EPA. During the IR Camera Inspection, XTO shall also confirm, for each combustion device used in the associated Vapor Control System, that a pilot light is present. An IR Camera Inspection of a Tank System and related combustion devices completed pursuant to subparagraph 9.a (Vapor Control System Initial Verification) during a monthly inspection period shall also count as an inspection for purposes of this Paragraph. These IR Camera Inspections shall begin no later than 120 days after the Effective Date.

      (2)      In the event that VOC emissions from a Tank System, an associated open-ended line, or an associated combustion device without flame presence indicating combustion, are observed or detected during an inspection under this Paragraph, or that a combustion device is observed to not have a pilot light present during an inspection under this Paragraph, XTO shall comply with the requirements of Paragraph 12 (Reliable Information, Investigation, and Corrective Action).

      (3)      XTO shall maintain records of the following for each inspection and this information shall be provided in a spreadsheet with each Semi-Annual Report:

            (a)      The date, time, Well Pad, Tank System, number of Storage Tanks inspected, and number of combustion devices inspected;

(b)     The date and time of any period where VOC emissions are observed from: 1) a combustion device without flame presence indicating combustion; 2) a PRD/thief hatch or other opening on Storage Tanks, except for VOC emissions that are reasonably required for maintenance or gauging; 3) an open-ended line (*e.g.*, vent line, blowdown valve or line); or 4) a combustion device does not have a pilot light present; and

(c)     The model and manufacturer, where available, of any combustion devices found with: 1) VOC emissions observed without flame presence indicating combustion; or 2) no pilot light present.

12.     Reliable Information, Investigation, and Corrective Action.

a.     Within five Calendar Days after XTO obtains any Reliable Information, XTO shall either (i) complete all necessary corrective actions to address the VOC emissions or issues identified or (ii) temporarily shut-in Production Operations associated with the Tank System. The five day period in the preceding sentence to complete all necessary corrective actions or temporarily shut-in shall be extended an additional 10 Calendar Days due to any of the following: (1) parts are unavailable due to back orders, shipment delay, etc.; (2) major safety concerns (specific reason must be documented); and/or (3) unavailable outside resources after contacting a reasonable number of vendors/contractors (specific reason and contacts must be documented). In the event that Production Operations are temporarily shut-in, XTO shall proceed as follows:

23

(1)      If the Tank System has not yet undergone an Engineering

Evaluation, Production Operations shall remain shut-in until the Engineering

Evaluation and any necessary modifications have been completed, and XTO shall

comply with the requirements of subparagraph 9.a (Vapor Control System Initial

Verification) at that Tank System within 30 days of resuming any Production

Operations associated with that Tank System.

(2)      If the Tank System has already undergone an Engineering

Evaluation, Production Operations shall remain shut-in until completion of any

necessary corrective actions, including, if appropriate, a re-evaluation of the

Vapor Control System and Emission Factor. If a re-evaluation of the Vapor

Control System and Emission Factor is appropriate and results in any

modification at the Tank System, XTO shall comply with the requirements of

subparagraph 9.a (Vapor Control System Initial Verification) at that Tank System

within 30 days of resuming any Production Operations associated with that Tank

System.

b.      For each Tank System with associated Production Operations temporarily

shut-in pursuant to the requirements of this Paragraph, XTO shall document in a

spreadsheet the following:

(1)      The date Reliable Information was obtained resulting in a

temporary shut-in;

(2)      The Tank System identification;

(3)      The date that such Production Operations were temporarily shut-in;

(4)      The date corrective actions were made, including a description of

24

the corrective actions;

       (5)     The date that Production Operations were resumed; and

       (6)     The date post-repair/Engineering Evaluation that an IR Camera

Inspection was completed, and a summary of the results of that inspection.

       c.     For each instance where XTO obtains Reliable Information, and within the

deadline provided in subparagraph 12.a, above completes all necessary corrective actions,

XTO shall document in a spreadsheet the following:

       (1)     The date Reliable Information was obtained;

       (2)     The identification of the Tank System; and

       (3)     The date corrective actions were made, including a description of

the corrective actions.

       d.     XTO shall attach copies of the spreadsheets required by this Paragraph to

the next Semi-Annual Report that follows at least 30 days after corrective actions or any

required IR Camera Inspection is completed.

     13.    <u>Performance Standard.</u>  Following the completion of an Engineering Evaluation

and any necessary modifications at a Tank System, XTO shall:

       a.     "[O]perate and maintain all liquid and gas collection, storage, processing

and handling operations, regardless of size, so as to minimize leakage of natural gas

emissions to the atmosphere," 40 C.F.R. § 49.4164(a);

       b.     "[E]quip all openings on each produced oil storage tank and produced

water storage tank interconnected with produced oil storage tanks with a cover to ensure

that all natural gas emissions are efficiently being routed through a closed-vent system to

a vapor recovery system, an enclosed combustor, a utility flare, or a pit flare," 40 C.F.R.

§ 49.4165(a);

      c.      Ensure that "[e]ach cover and all openings on the cover (e.g., access hatches, sampling ports, pressure relief valves (PRV), and gauge wells) shall form a continuous impermeable barrier over the entire surface area of the produced oil and produced water in the storage tank," 40 C.F.R. § 49.4165(a)(1);

      d.      Set "[e]ach PRV . . . to release at a pressure that will ensure that natural gas emissions are routed through the closed-vent system to the vapor recovery system, the enclosed combustor, or the utility flare under normal operating conditions," 40 C.F.R. § 49.4165(a)(4);

      e.      Ensure that "[e]ach closed-vent system . . . route[s] all produced natural gas and natural gas emissions from production and storage operations to the natural gas sales pipeline or the control devices required by [Section 49.4165(a) the Fort Berthold FIP]," 40 C.F.R. § 49.4165(b)(1);

      f.      Properly maintain and operate "[a]ll vent lines, connections, fittings, valves, relief valves, or any other appurtenance employed to contain and collect natural gas, vapor, and fumes and transport them to a natural gas sales pipeline and any VOC control equipment," 40 C.F.R. § 49.4165(b)(2); and

      g.      Design "[e]ach closed-vent system . . . to operate with no detectable natural gas emissions," 40 C.F.R. § 49.4165(b)(3).

## V.    ENVIRONMENTAL MITIGATION PROJECT

14.     XTO shall implement the Environmental Mitigation Project ("Project") described in Appendix B in compliance with the approved plan and schedule for such Project and other terms of this Consent Decree.

26

15.     XTO shall maintain and, within 30 days of an EPA request, provide copies of all documents to identify and substantiate the costs expended to implement the Project described in Appendix B.

16.     All plans and reports prepared by XTO pursuant to the requirements of this Section V (Environmental Mitigation Projects) and required to be submitted to EPA shall be made available to the public from XTO upon request and without charge.

17.     XTO shall certify, as part of each plan submitted to EPA for any Project, that:

        a.     XTO is not required to perform the Project by any federal, state, or local law or regulation or by any agreement, grant, or as injunctive relief awarded in any other action in any forum;

        b.     The Project is not a project that XTO was planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Consent Decree; and

        c.     XTO has not received and will not receive credit for the Project in any other enforcement action.

18.     XTO shall use its best efforts to secure as much environmental benefit as possible for the Project, consistent with the applicable requirements and limits of this Decree.

19.     XTO shall comply with the reporting requirements described in Appendix B.

20.     In connection with any communication to the public or shareholders regarding XTO's actions or expenditures relating in any way to the Environmental Mitigation Project in this Decree, XTO shall include prominently in the communication the information that the actions and expenditures were required as a part of a Decree.

21.     Within 60 days following the completion of the Project required under this Consent Decree (including any applicable periods of demonstration or testing), XTO shall submit to EPA a report that documents the date the Project was completed, the results achieved by implementing the Project, including a general discussion of the environmental benefits and, where feasible, the estimated emissions reductions, and the costs expended by XTO in implementing the Project.

## VI.     CIVIL PENALTY

22.     Within 30 days after the Effective Date, XTO shall pay to the United States the sum of $320,000 as a civil penalty pursuant to Section 113 of the Act, 42 U.S.C. § 7413. If any portion of the civil penalty is not paid when due, XTO shall pay interest on the amount past due, accruing from the Effective Date through the date of payment at the rate specified in 28 U.S.C. § 1961.

23.     Payment Instructions. XTO shall pay the civil penalty by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice account in accordance with current EFT procedures. The costs of such EFT shall be XTO's responsibility. Payment shall be made in accordance with instructions to be provided to XTO by the Financial Litigation Unit (FLU) of the U.S. Attorney's Office for the District of North Dakota. The payment instructions provided by the FLU will include a Consolidated Debt Collection System (CDCS) number that XTO shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to: Rodney Barnwell, XTO Energy Inc., 810 Houston Street, TLB-2110, Fort Worth, TX, 76102, email: Rodney_Barnwell@xtoenergy.com, on behalf of XTO. XTO may change the individual to receive payment instructions on its behalf by providing written notice of such change in accordance with Section XIV (Notices).

24.     At the time of payment, XTO shall send notice that payment has been made: (i) to EPA via email at acctsreceivable.cinwd@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 Martin Luther King Drive, Cincinnati, Ohio 45268; (ii) to the United States via email or regular mail in accordance with Section XIV (Notices); and (iii) to EPA in accordance with Section XIV (Notices). Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in United States v. XTO Energy Inc., and shall reference the civil action number, CDCS number, and DOJ case number 90-5-2-1-11656.

25.     Not Tax Deductible. XTO shall not deduct any penalties paid under this Consent Decree pursuant to this Section or Section VIII (Stipulated Penalties) in calculating its federal, state, or local income tax.

## VII.   PERIODIC REPORTING

26.     After entry of this Consent Decree, XTO shall submit to the United States in accordance with the requirements of Section XIV (Notices), a periodic Semi-Annual Report within 60 days after the end of each half of the calendar year (i.e., January through June, and July through December). Each Semi-Annual Report shall contain the following information:

a.     Tank Vapor Emission Factor (Paragraph 6): A copy of any Emission Factors and all supporting inputs, assumptions, and calculations if the Emission Factor was revised during the reporting period.

b.      VCS Capacity (Paragraph 7): Copies of any VCS Capacity calculations performed during the reporting period.

c.     Vapor Control System Field Survey, Engineering Evaluation, and Modification (Paragraph 8): Status and/or completion of Engineering Evaluations and any modifications, including a list of any Tank Systems with associated Production

Operations temporarily shut-in pending completion of the Engineering Evaluation and any modifications during the reporting period, a summary of modifications to Vapor Control Systems, and the information specified in subparagraph 8.a(3) for Tank Systems that underwent the subparagraph 8.b evaluation during the reporting period.

       d.      <u>Post-Certification of Completion Modifications</u> (Paragraph 10): A summary of any evaluations undertaken during the reporting period of whether modifications were necessary at Vapor Control Systems for other Tank Systems and the timing, results, locations, and description of any modifications of other Vapor Control Systems or maximum allowable production rates or a timeline for the completion of such modifications.

       e.      <u>Directed Inspection and Preventative Maintenance Program</u> (Paragraph 11):  Status as to development and implementation of the DI/PM program, and a summary of IR Camera Inspections undertaken pursuant to subparagraph 11.e, including attachment of the information identified in subparagraph 11.e(3).

       f.      <u>Reliable Information, Investigation, and Corrective Action</u> (Paragraph 12): Copies of the spreadsheets and information as specified and required by subparagraph 12.d.

       g.      <u>Environmental Mitigation Project</u> (Section V and Appendix B):  A summary of activities undertaken, status of Environmental Mitigation Project milestones set forth in Appendix B, and a summary of costs incurred since the previous report.

       h.      A description of any non-compliance with the requirements of this Consent Decree and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.

27.     If XTO violates, or has reason to believe that it may violate, any requirement of this Consent Decree with an associated stipulated penalty, XTO shall notify the United States in accordance with the requirements of Section XIV (Notices) of such violation and its likely duration, in writing, within 10 Business Days of the day XTO first becomes aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully explained at the time the report is due, XTO shall so state in the report. XTO shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 days of the day XTO becomes aware of the cause of the violation.  Nothing in this Paragraph or the following Paragraph relieves XTO of its obligation to provide the notice required by Section IX (Force Majeure). If EPA becomes aware of any violation of any requirement of this Consent Decree, EPA will use best efforts to promptly notify XTO of such violation.

28.     Whenever any event affecting XTO's performance under this Consent Decree may pose an immediate threat to the public health or welfare or the environment, XTO shall comply with any applicable federal and state or local laws and, in addition, shall notify EPA as per Section XIV (Notices) orally or by electronic or facsimile transmission as soon as possible, but no later than 24 hours after XTO first knew of the violation or event. This notice requirement is in addition to the requirement to provide notice of a violation of this Decree set forth in the preceding Paragraph.

29.     Each report submitted by XTO under this Section, and each Certification of Completion Report submitted pursuant to the requirements of subparagraph 9.c (Vapor Control

System Initial Verification), shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

This certification requirement does not apply to emergency notifications where compliance would be impractical.

30.     The reporting requirements of this Consent Decree do not relieve XTO of any reporting obligations required by the Act, or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

31.     Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Decree and as otherwise permitted by law.

## VIII.   STIPULATED PENALTIES

32.     XTO shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified below, unless excused under Section IX (Force Majeure), or reduced or waived by the United States pursuant to Paragraph 38 of the Decree.  A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

a.      Compliance Requirements.

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| Failure to evaluate the condition of all PRDs/thief hatches, mountings, and gaskets at each Storage Tank as required by Paragraph 8.a and/or take the actions required by Paragraphs 8.a(1) or 8.a(2) (Vapor Control System Field Survey, Engineering Evaluation, and Modification) | $500 per day per Tank System for the first 30 days of noncompliance; $2,500 per day per Tank System thereafter. |
| Failure to comply with the requirements of Paragraph 8.a(3) (Vapor Control System Field Survey, Engineering Evaluation, and Modification) | $5000 per Tank System. |
| Failure to complete an Engineering Evaluation for a Tank System as required by Paragraph 8.b (Engineering Evaluation) | For each Tank System unless associated Production Operations temporarily shut-in as required by Paragraphs 8.e and 8.f: $1,000 per day per violation for the first 15 days of noncompliance; $2,500 per day per violation from the 16th to 30th days of noncompliance; and $5,000 per day per violation thereafter. |
| Failure to complete modifications for a Vapor Control System as required by 8.c (Vapor Control System Modification) | For each Vapor Control System unless associated Production Operations temporarily shut-in as required by Paragraphs 8.e and 8.f: $1,000 per day per violation for the first 15 days of noncompliance; $3,000 per day per violation from the 16th to 30th days of noncompliance; and $9,000 per day per violation thereafter. |
| Failure to conduct an IR Camera Inspection as required by Paragraph 9.a (Vapor Control System Initial Verification) | $500 per day per Vapor Control System for the first 15 days of noncompliance; $1,000 per day per violation from the 16th to 30th days of noncompliance; and $2,000 per day per violation thereafter. |
| Failure to complete and submit a Certification of | $500 per day for the first 15 days of |

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| Completion Report as required by Paragraph 9.c (Vapor Control System Initial Verification) | noncompliance; $2,500 per day from the 16th to 30th days of noncompliance; and $5,000 per day thereafter. |
| Failure to implement an approved DI/PM program at each Tank System, and associated Well Pad, as required by Paragraph 11 (Directed Inspection and Preventative Maintenance Program) | $500 per day per Well Pad for the first 30 days of noncompliance; $2,500 per day per Well Pad thereafter. |
| Failure to provide written notification to MHA Nation of IR Camera Inspection (s), as required by Paragraph 11.e (Periodic IR Camera Inspections) | $500 per violation |
| Failure to conduct periodic inspections as required by Paragraph 11.e (Periodic IR Camera Inspections). In the event that XTO fails to conduct periodic inspections as required by Paragraph 11.e, EPA will not also assess a separate stipulated penalty for the failure to maintain records of the missed periodic inspections. | $500 per day per Vapor Control System for the first 30 days of noncompliance; $2,500 per day per Tank System thereafter, up and until the next IR Camera Inspection required by Paragraph 11.e has been conducted. |
| Failure to maintain records documenting Periodic IR Camera Inspection information in Paragraph 11.e(3) (Periodic IR Camera Inspections) | $5000 per Periodic IR Camera Inspection per Tank System. |
| Failure to complete all necessary corrective actions or temporarily shut-in Production Operations as required by Paragraph 12.a (Reliable Information, Investigation, and Corrective Action) | $5,000 per day per Tank System for the first 15 days of noncompliance; $10,000 per day per Tank System from the 16th to 30th days of noncompliance; and $20,000 per day per Tank System thereafter. |

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| Failure to comply with the requirements of Paragraphs 12.b, 12.c, or 12.d (Reliable Information, Investigation, and Corrective Action) | $2500 per Vapor Control System. |

      b.      Environmental Mitigation Project.

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| Failure to complete the Environmental Mitigation Project in compliance with Section V and Appendix B to this Decree | $1,000 per day for the first 30 days of noncompliance; $5,000 per day thereafter. |

      c.      Periodic Reports.

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| Failure to submit a Semi-Annual Report as required by Paragraph 26 | $1,000 per day for the first 30 days of noncompliance; and $2,500 per day thereafter. |

33.    <u>Late Payment of Civil Penalty</u>.  If XTO fails to pay the civil penalty required to be paid under Section VI (Civil Penalty) when due, XTO shall pay a stipulated penalty of $2,000 per day for each day that the payment is late to the United States.

34.    Stipulated penalties under this Section shall begin to accrue on the day after performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

35.    XTO shall pay stipulated penalties to the United States within 30 days of a written demand by the United States, unless XTO invokes the dispute resolution procedures under

Section X (Dispute Resolution) within the 30-day period. A written demand by the United States for the payment of stipulated penalties will identify the particular violation(s) to which the stipulated penalty relates, the stipulated penalty amount that the United States is demanding for each violation (as can be best estimated), the calculation method underlying the demand, and the grounds upon which the demand is based. Prior to issuing a written demand for stipulated penalties, the United States may, in its unreviewable discretion, contact XTO for informal discussion of matters that the United States believes may merit stipulated penalties.

36.      Stipulated penalties shall continue to accrue as provided in Paragraph 34, during any Dispute Resolution, but need not be paid until:

  a.  If the dispute is resolved by agreement or by a decision of EPA that is not appealed to the Court, XTO shall pay accrued penalties agreed to or determined to be owing, together with interest, to the United States within 30 days of the effective date of the agreement or the receipt of EPA's decision or order;

  b.  If the dispute is appealed to the Court and the United States prevails in whole or in part, XTO shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 days of receiving the Court's decision or order, except as provided in subparagraph c, below; or

  c.  If any Party appeals the District Court's decision, XTO shall pay all accrued penalties determined to be owing, together with interest, within 15 Business Days of receiving the final appellate court decision.

37.      If XTO fails to pay stipulated penalties within 30 days after receiving the United States' written demand, XTO shall pay interest on unpaid stipulated penalties, as provided for in 28 U.S.C. § 1961, as follows: (a) if XTO has timely invoked dispute resolution such that the

obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, interest accrues from the date stipulated penalties are due pursuant to Paragraph 36 until the date of payment; and (b) if XTO does not timely invoke dispute resolution, interest accrues from XTO's receipt of the written demand pursuant to Paragraph 35 until the date of payment. Nothing in this Paragraph limits the United States from seeking any remedy otherwise provided by law for XTO's failure to pay any stipulated penalties or interest.

38.     The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

39.     XTO shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraphs 23 (Payment Instructions) and 24, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

40.     Subject to the provisions of Section XII (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States for XTO's violation of this Decree or applicable law. Where a violation of this Decree is also a violation of relevant statutory or regulatory requirements, XTO shall be allowed a credit, for any stipulated penalties paid, against any statutory penalties imposed for such violation under the applicable federal or State requirement.

## IX.     FORCE MAJEURE

41.     "Force majeure," for purposes of this Consent Decree, means any event arising from causes beyond the control of XTO, of any entity controlled by XTO, or of XTO's contractors that delays or prevents the performance of any obligation under this Decree despite

XTO's best efforts to fulfill the obligation. The requirement that XTO exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (i) as it is occurring and (ii) after it has occurred to minimize any resulting delay and any adverse effects to the greatest extent possible. "Force majeure" does not include XTO's financial inability to perform any obligation under this Consent Decree.

42.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, for which XTO intends or may intend to assert a claim of force majeure, XTO shall provide notice orally or by electronic transmission to EPA as provided in Section XIV (Notices), within three days of when XTO first knew that the event might cause a delay. Within 10 days thereafter, XTO shall provide in writing to EPA (i) an explanation and description of the reasons for the delay; (ii) the anticipated duration of the delay; (iii) all actions taken or to be taken to prevent or minimize the delay; (iv) a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; and (v) XTO's rationale for attributing such delay to a force majeure event if it intends to assert such a claim. XTO shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure. XTO will be deemed to know of any circumstance of which XTO, any entity controlled by XTO, or XTO's contractors knew or should have known. Failure to comply with the above requirements regarding an event precludes XTO from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late notice, is able to assess to its satisfaction whether the event is a force majeure under Paragraph 41 and whether XTO has exercised best efforts under Paragraph 41, EPA may, in its

unreviewable discretion, excuse in writing XTO's failure to submit timely notices under this Paragraph.

43.     If EPA agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this Consent Decree that are affected by the force majeure will be extended by EPA, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure does not, of itself, extend the time for performance of any other obligation. EPA will notify XTO in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

44.     If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify XTO in writing of its decision.

45.     If XTO elects to invoke the dispute resolution procedures set forth in Section X (Dispute Resolution), it shall do so no later than 30 days after receipt of EPA's notice. In any such proceeding, XTO bears the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that XTO complied with the requirements of Paragraphs 41 and 42. If XTO carries this burden, the delay at issue will be deemed not to be a violation by XTO of the affected obligation of this Consent Decree identified to EPA and the Court.

## X.     DISPUTE RESOLUTION

46.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section are the exclusive mechanism to resolve disputes arising

under or with respect to this Decree, provided that the Party invoking such procedure has first made a good faith attempt to resolve the matter with the other Party.

47.     The dispute resolution procedure required herein shall be invoked by one Party providing a brief written notice to the other Party advising of a dispute pursuant to this Section. The notice shall describe the nature of the dispute and shall state the noticing Party's position with regard to such dispute. The Party receiving such a notice shall acknowledge receipt of the notice, and the Parties in dispute shall expeditiously schedule a meeting to discuss the dispute not later than 30 days following receipt of such notice.

48.     Disputes submitted to dispute resolution under this Section shall, in the first instance, be the subject of negotiations among the disputing Parties. Such period of negotiations shall not extend beyond 30 days from the date of the first meeting among the Parties' representatives unless they agree in writing to shorten or extend this period.

49.     If the Parties are unable to reach agreement during the negotiation period, the United States shall provide XTO with a written summary of its position regarding the dispute. The written position provided by EPA shall be considered binding unless, within 45 days thereafter, XTO seeks judicial resolution of the dispute by filing a petition with this Court. The United States may respond to the petition within 45 days of filing.

50.     Where the nature of the dispute is such that a more timely resolution of the issue is required, the time periods set forth in this Section may be shortened upon motion of one of the Parties to the dispute.

51.     This Court shall not draw any inferences nor establish any presumptions adverse to either Party as a result of invocation of this Section or the Parties' inability to reach agreement.

52.     As part of the resolution of any dispute under this Section, in appropriate circumstances the Parties may agree, or this Court may order, an extension or modification of the schedule for completion of the activities required under this Consent Decree to account for the delay that occurred as a result of dispute resolution. XTO shall be liable for stipulated penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule, provided that XTO shall not be precluded from asserting that a force majeure event has caused or may cause delay in complying with the extended or modified schedule.

53.     The Court shall decide all disputes pursuant to applicable principles of law for resolving such disputes. In their initial filings with the Court, the Parties shall state their respective positions as to the applicable standard of law for resolving the particular dispute.

## XI.     INFORMATION COLLECTION AND RETENTION

54.     The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times (subject to any applicable federal health and safety laws and regulations), upon presentation of credentials, to conduct the following:

a.      Monitor the progress of activities required under this Decree;

b.      Verify any data or information submitted to the United States in accordance with the terms of this Decree;

c.      Obtain samples and, upon request, splits or duplicates of any samples taken by XTO or its representatives, contractors, or consultants related to activities under this Decree;

d.      Obtain documentary evidence, including photographs and similar data related to activities required under this Decree; and

41

e.      Assess XTO's compliance with this Decree.

55.      Upon request, XTO shall provide EPA or its authorized representatives, splits or duplicates of any samples taken by XTO at a Tank System or other associated equipment. Upon request, EPA shall provide XTO splits or duplicates of any samples taken by EPA or its authorized representatives.

56.      Until two years after the termination of this Consent Decree, XTO shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) (hereinafter referred to as "Records") in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that directly relate to XTO's performance of its obligations under this Decree. This information-retention requirement applies regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States, XTO shall provide copies of any Records required to be maintained under this Paragraph. This retention requirement does not apply to voicemail messages or text messages, so long as those forms of communication are not used for substantive discussions concerning compliance with the Decree. Nor does this retention requirement apply to XTO's outside counsel or consultants retained specifically for the purposes of potential litigation.

57.      <u>Privileged and Business Confidential Documents</u>.  In response to a request for Records pursuant to Paragraphs 55 or 56:

a.      XTO may assert that all or part of a Record is privileged or protected under federal law. If XTO asserts such a privilege, it shall provide the following: (1) the title of the Record; (2) the date of the Record; (3) the name and title of each author of the

Record; (4) the name and title of each addressee and recipient; (5) a general description of the contents of the Record that does not reveal any privileged or protected information; and (6) the privilege or protection asserted by XTO. If a claim of privilege or protection applies only to a portion of a Record, the Record shall be provided to the United States in redacted form to mask the privileged or protected portion only. XTO shall retain all Records that it claims to be privileged or protected until the United States has had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in XTO's favor.

       b.     XTO may also assert business confidentiality claims covering part or all of the Records required to be provided under this Section to the extent permitted by and in accordance with 40 C.F.R. § 2.203(b). Records determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to EPA, or if EPA has notified XTO that the Records are not confidential and followed the procedures in 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to XTO.

       c.     XTO may make no claim of privilege or protection (other than claims of Confidential Business Information) regarding any Records that XTO is required to create or generate pursuant to this Consent Decree.

58.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of XTO to

maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

59.    This Consent Decree resolves the civil and administrative claims that the United States may have against XTO for the following violations at the Tank Systems located on the FBIR listed in Appendix A, including associated Vapor Control Systems, through the Date of Lodging:

a.    Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4164(a), to "operate and maintain all liquid and gas collection, storage, processing and handling operations, regardless of size, so as to minimize leakage of natural gas emissions to the atmosphere;"

b.    Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4164(d), that "[w]ithin ninety (90) days of the first date of production . . . [r]oute all standing, working, breathing, and flashing losses from the produced oil storage tanks and any produced water storage tanks interconnected with the produced oil storage tanks through a closed vent-system to: . . . (i) [a]n operating system designed to recover and inject the natural gas emissions into a natural gas gathering pipeline system for sale or other beneficial purpose; or (ii) an enclosed combustor or utility flare capable of reducing the mass content of VOC in the natural gas emissions vented to the device by at least 98.0 percent or greater and operated as specified in §§ 49.4165(c) and 49.4166;"

c.    Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4165(a), that "all openings on each produced oil storage tank and produced water storage tank interconnected with produced oil storage tanks [be equipped] with a cover to

44

ensure that all natural gas emissions are efficiently being routed through a closed-vent system to a vapor recovery system, an enclosed combustor, a utility flare, or a pit flare;"

      d.      Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4165(a)(1), that "[e]ach cover and all openings on the cover (e.g., access hatches, sampling ports, pressure relief valves (PRV), and gauge wells) shall form a continuous impermeable barrier over the entire surface area of the produced oil and produced water in the storage tank;"

      e.      Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4165(a)(2), that "[e]ach cover opening shall be secured in a closed, sealed position (e.g., covered by a gasketed lid or cap) whenever material is in the unit on which the cover is installed except [during those times when it is necessary to use an opening to add or remove material, inspect or sample material, or inspect or repair equipment];"

      f.      Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4165(a)(3), that "[e]ach thief hatch cover shall be weighted and properly seated;"

      g.      Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4165(a)(4), that "[e]ach PRV shall be set to release at a pressure that will ensure that natural gas emissions are routed through the closed-vent system to the vapor recovery system, the enclosed combustor, or the utility flare under normal operating conditions;"

      h.      Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4165(b)(1), that "[e]ach closed-vent system must route all produced natural gas and natural gas emissions from production and storage operations to the natural gas sales pipeline or the control devices required by [Section 49.4165(a) the Fort Berthold FIP];"

      i.      Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R.

§ 49.4165(b)(2), that "[a]ll vent lines, connections, fittings, valves, relief valves, or any other appurtenance employed to contain and collect natural gas, vapor, and fumes and transport them to a natural gas sales pipeline and any VOC control equipment must be maintained and operated properly at all times;"

      j.     Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4165(b)(3), that "[e]ach closed-vent system must be designed to operate with no detectable natural gas emissions;"

      k.     Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4165(d)(3)(iii), that "[t]he pit flare is operated with no visible smoke emissions;" and

      l.     Failure to comply with the requirement of the Fort Berthold FIP, 40 C.F.R. § 49.4168(b), that true, accurate, and complete annual reports be submitted to EPA containing the information required by the Fort Berthold FIP.

60.     The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 59. This Consent Decree does not limit the rights of the United States to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal or state laws, regulations, or permit conditions, except as expressly specified in Paragraph 59. The United States further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, the Tank Systems and associated Vapor Control Systems, whether related to the violations addressed in this Decree or otherwise.

61.     In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, or other appropriate relief relating to the Tank Systems

and associated Vapor Control Systems or XTO's violations, XTO shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 59.

62.     This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. XTO is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and XTO's compliance with this Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States does not, by its consent to the entry of this Decree, warrant or aver in any manner that XTO's compliance with any aspect of this Decree will result in compliance with provisions of the Act or the Fort Berthold FIP, or with any other provisions of federal, State laws, regulations, or permits.

63.     This Consent Decree does not limit or affect the rights of XTO or of the United States against any third parties, not party to this Decree, nor does it limit the rights of third parties, not party to this Decree, against XTO, except as otherwise provided by law.

64.     This Consent Decree does not create rights in, or grant any cause of action to, any third party not party to this Decree.

### XIII.   COSTS

65.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees)

incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by XTO.

## XIV.   NOTICES

66.    Unless otherwise specified in this Consent Decree, whenever notifications, submissions, or communications are required by this Decree, they shall be made electronically, unless otherwise requested, and addressed as follows:

| | |
|---|---|
| As to the United States by email: | eescdcopy.enrd@usdoj.gov<br>Re: DJ # 90-5-2-1-11261 |
| As to the United States by mail: | EES Case Management Unit<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C.  20044-7611<br>Re: DJ # 90-5-2-1-11261 |
| As to EPA by email: | R8AirReportEnforcement@epa.gov and<br>North.Alexis@epa.gov |
| As to EPA by mail: | Director, Air Enforcement Division<br>Office of Civil Enforcement<br>USEPA Headquarters, MC 2242A<br>1200 Pennsylvania Ave., NW<br>Washington, D.C. 20460 |
| | Director, Air & Toxics Technical Enforcement<br>Office of Enforcement, Compliance & |

48

                                        Environmental Justice
                                          Environmental Protection Agency, Region 8
                                          1595 Wynkoop Street
                                          Denver, CO  80202

As to XTO by email:              FBIR.ConsentDecree@xtoenergy.com

As to XTO by mail:               XTO Energy Inc.
                                          Attn: Operations Manager
                                          321 22nd Avenue East
                                          Williston, ND 58801

                                          XTO Energy Inc.
                                          Attn: Environmental, Health, and Safety Department
                                          810 Houston St.
                                          Fort Worth, Texas 76102

67.     Any Party may, by written notice to the other Party, change its designated notice recipient or notice address provided above.

68.     Notices submitted pursuant to this Section shall be deemed submitted upon electronic transmission or mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing. Notifications or communications mailed to XTO shall be deemed to be received on the earlier of: (i) actual receipt by XTO; or (ii) receipt of an electronic version sent to the addressees set forth in this Paragraph. An email is presumed to have been received on the day it is sent. With the exception of notices sent pursuant to the Force Majeure Section IX, if the date for submission of a report, study, notification, or other communication falls on a Saturday, Sunday or federal holiday, the report, study, notification, or other communication will be deemed timely if it is submitted the next business day.

## XV.   SALES OR TRANSFERS OF OPERATIONS

69.     This Consent Decree does not prohibit the sale or transfer of XTO's ownership of a working interest in any well, or any well and associated Tank System, provided that XTO both

(a) remains the Operator of the well and associated Tank System and (b) retains the minimum working interest necessary to remain the Operator of the well and associated Tank System.

70.     If XTO proposes to sell an operational interest in, or transfer Operation of, any well associated with a Tank System to a third party unaffiliated with XTO, XTO shall, at least 30 days prior to the sale or transfer, (i) notify the United States of the proposed sale or transfer and of the specific Consent Decree provisions that XTO proposes the transferee assume; (ii) certify that the transferee is contractually bound to assume the obligations and liabilities of the Consent Decree; and (iii) submit a certified statement from the transferee describing how the transferee has both the financial and technical ability to assume the obligations and liabilities of the Consent Decree.

71.     No sale or transfer of an operational interest in, or the operation of, any well associated with a Tank System shall relieve XTO of its obligations to ensure that the terms of the Consent Decree are implemented unless and until the Court has approved a modification pursuant to Section XVIII (Modification) of this Consent Decree substituting the third party as a party to this Consent Decree with respect to the well(s) and associated Tank System(s) that are the subject of the sale or transfer.

72.     No earlier than 30 days after giving notice of a proposed sale or transfer pursuant to Paragraph 70(i), XTO may file a motion with the Court to modify this Consent Decree in accordance with Section XVIII to make the terms and conditions of this Consent Decree specifically relating to the well(s) and associated Tank System(s) sold or transferred applicable to the transferee. XTO shall be released from the specific obligations and liabilities of this Consent Decree relating to the well(s) and associated Tank System(s) sold or transferred unless

the United States opposes the motion and the Court finds that the transferee does not have the financial and technical ability to assume the obligations and liabilities under this Consent Decree.

73.     This Consent Decree shall not be construed to impede the transfer of an operational interest in, or the Operation of, any well associated with a Tank System to a third party unaffiliated with XTO so long as the requirements of this Consent Decree are met.

74.     Notwithstanding anything to the contrary in this Section, XTO may not assign, and may not be released from, any obligation under this Consent Decree that is not specific to the purchased or transferred Tank Systems and associated well production assets, including the obligations set forth in Sections V (Environmental Mitigation Projects) and VI (Civil Penalty).

75.     Effect of Plugging and Abandonment. The permanent plugging and abandonment of a well ("P&A") shall be deemed to satisfy all requirements of this Consent Decree applicable to the well and Tank System servicing that well. If the Tank System is servicing wells that have not been plugged and abandoned, the provisions of this paragraph do not apply. To P&A a well, XTO must file with the appropriate regulatory agency (i.e., the North Dakota Industrial Commission or the U.S. Bureau of Land Management, or both, as applicable) a Notice of Intent to Plug and Abandon a Well, which includes a downhole schematic setting forth the actions to be taken to cement off the producing formations (the "Downhole Work"). After the Downhole Work has been completed, XTO will file a Plugging and Abandonment Subsequent Report ("Subsequent Report") confirming that the Downhole Work was completed. After the regulatory agency's receipt of the Subsequent Report, the well will be deemed to have been permanently plugged and abandoned. XTO shall maintain copies of all documentation required by this Paragraph for inspection and review by EPA. In each Semi-Annual Report, XTO shall update Appendix A to reflect any associated Tank Systems for which all wells have been permanently

plugged and abandoned. Nothing herein shall preclude XTO from reusing any equipment from a plugged and abandoned well.

## XVI.   EFFECTIVE DATE

76.     The Effective Date of this Consent Decree is the date upon which the approval of the Decree is recorded on the Court's docket or a motion to enter the Consent Decree is granted, whichever occurs first; provided, however, that XTO hereby agrees that it shall be bound to perform any specific duties scheduled to occur prior to the Effective Date. In the event the United States withdraws or withholds consent to this Decree before entry, or the Court declines to enter the Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date terminates.

## XVII.  RETENTION OF JURISDICTION

77.     The Court retains jurisdiction over this case until termination of this Consent Decree pursuant to Section XIX (Termination) for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections X (Dispute Resolution) and XVIII (Modification), or effectuating or enforcing compliance with the terms of this Decree.

## XVIII.MODIFICATION

78.     The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to this Decree, it is effective only upon approval by the Court.

79.     Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section X (Dispute Resolution). The Party seeking the modification bears the burden

of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XIX.  TERMINATION

80.     <u>Termination as to Specific Tank System(s)</u>.  Notwithstanding the provisions of Section XV (Sales or Transfers of Operations), and independent from the provisions of Section XV (Sales or Transfers of Operations), XTO may seek consent to terminate the requirements of this Consent Decree with respect to Tank System(s) (and associated wells and well production assets so long as those associated wells and well production assets are not also associated with a Tank System that will remain subject to the requirements of the Consent Decree) that have completed all requirements of Paragraphs 8 and 9 (including evaluation of PRDs/thief hatches, Engineering Evaluation, and any necessary modifications) and which are to be transferred entirely from XTO's operational control (herein "Request for Termination of a Tank System").

a.      Such requests for termination shall be provided to the United States in writing and contain the date a Certification of Completion Report was submitted for the Tank System(s); or if such report has not been submitted, XTO shall submit a Certification of Completion Report for the Tank System(s) in accordance with the requirements in Paragraph 9 (Vapor Control System Initial Verification).

b.      Until such time as the United States consents to XTO's Request for Termination of a Tank System, XTO's obligations under this Consent Decree shall remain in effect as to such Tank System(s). Such consent shall not be unreasonably withheld or delayed.

c.      Under no circumstances may XTO seek termination pursuant to this Paragraph involving more than five Tank Systems subject to this Consent Decree.

      d.     This Section, including the calculation of the five Tank Systems, shall operate independently from the provisions in Section XV (Sales or Transfers of Operations).

81.     After XTO has: 1) completed the requirements of Paragraphs 6, 7, 8, 9, 10 (as may be applicable up to that time); 2) completed Section V (Environmental Mitigation Projects); 3) substantially complied with Paragraphs 10, 11, 12, and 13 for at least three years after the Effective Date; and 4) paid the civil penalty and any accrued stipulated penalties not waived or reduced by the United States pursuant to Paragraph 38, XTO may send to the United States a Request for Termination of this Consent Decree, which shall be certified in accordance with Paragraph 29, stating that XTO has satisfied those requirements, together with all necessary supporting documentation.

82.     Following receipt by the United States of XTO's Request for Termination of this Consent Decree, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether XTO has satisfactorily complied with the requirements for termination of this Consent Decree, including documentation of compliance with and completion of each requirement. If the United States agrees that XTO has complied with the requirements for termination, such agreement not to be unreasonably withheld, the Decree may be terminated, and the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

83.     If the United States does not agree that the Consent Decree may be terminated or does not agree that the applicability of the Consent Decree to a particular Tank System, pursuant to Paragraph 80, may be terminated, XTO may invoke Dispute Resolution under Section X (Dispute Resolution). However, XTO shall not seek Dispute Resolution of any dispute regarding

54

termination until 45 days after service of its Request for Termination or the Request for Termination of a Tank System for the particular Tank System(s) in dispute.

## XX.   PUBLIC PARTICIPATION

84.     This Consent Decree will be lodged with the Court for a period of not less than 30 days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding this Decree disclose facts or considerations indicating that this Decree is inappropriate, improper, or inadequate. XTO consents to entry of this Decree without further notice and agrees not to withdraw from or oppose entry of this Decree by the Court or to challenge any provision of this Decree, unless the United States has notified XTO in writing that it no longer supports entry of this Decree.

## XXI.   SIGNATORIES/SERVICE

85.     Each undersigned representative of XTO and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

86.     This Consent Decree may be signed in counterparts, and its validity may not be challenged on that basis.

87.     XTO shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on its behalf with respect to all matters arising under or relating to this Consent Decree. XTO agrees to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court, including, but not

limited to, service of a summons. XTO need not file an answer to the Complaint in this action unless or until the Court expressly declines to enter this Decree.

## XXII. INTEGRATION/HEADINGS

88.     This Consent Decree and its Appendices constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. No other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

89.     Headings to the Sections and subsections of this Consent Decree are provided for convenience and do not affect the meaning or interpretation of the provisions of this Consent Decree.

## XXIII. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

90.     For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section II (Applicability), Paragraph 3, Section IV (Injunctive Relief), Paragraphs 6 – 13,  Section V (Environmental Mitigation Project), Paragraphs 14 - 21, Section VII (Periodic Reporting), Paragraphs 26 – 29, and Section XI (Information Collection and Retention), Paragraphs 54 – 56, is restitution or required to come into compliance with law.

## XXIV. FINAL JUDGMENT

91.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree constitutes a final judgment of the Court as to the United States and XTO.

## XXV.  APPENDICES

92.     The following Appendices are attached to and part of this Consent Decree:

"Appendix A" is the List of Tank Systems/Well Pads; and

"Appendix B" is Environmental Mitigation Project.

Dated and entered this 10th day of ____July____, 2018

_____
UNITED STATES DISTRICT JUDGE

57

THE UNDERSIGNED PARTY enters into this Consent Decree in this action captioned United States v. XTO Energy Inc.

FOR THE UNITED STATES OF AMERICA:

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

Date:_____

MARK C. ELMER
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Denver, CO 80202

THE UNDERSIGNED PARTY enters into this Consent Decree in this action captioned United States v. XTO Energy Inc.


FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY, REGION 8:

Date: 3/1/18

SUZANNE L BOHAN
Assistant Regional Administrator
Office of Enforcement, Compliance
  and Environmental Justice
U.S. Environmental Protection Agency, Region 8


Date: 2/27/18

SCOTT PATEFIELD
Director
Air & Toxics Technical Enforcement Program
Office of Enforcement, Compliance
  and Environmental Justice
U.S. Environmental Protection Agency, Region 8


Date: 02/08/2018

LAUREN HAMMOND
Attorney
Legal Enforcement Program
Office of Enforcement, Compliance
  and Environmental Justice
U.S. Environmental Protection Agency, Region 8

THE UNDERSIGNED PARTY enters into this Consent Decree in this action captioned United States v. XTO Energy Inc.

FOR XTO:

Date: 1/5/18

SARA ORTWEIN
President
XTO Energy Inc.

60

## Appendix A: Tank Systems

| Closed Vent System Number | Pad Number | Well Name | NDIC File Number |
|---|---|---|---|
| 1 | 1 | FBIR BAKER 34X-25 | 19292 |
| 1 | 1 | FBIR BAKER 34X-25A | 23394 |
| 1 | 1 | FBIR BAKER 34X-25E | 23395 |
| 1 | 1 | FBIR BAKER 34X-25F | 23393 |
| 1 | 1 | FBIR WALKER 34X-25 | 19293 |
| 2 | 2 | FBIR BEAKS 24X-8A | 23694 |
| 2 | 2 | FBIR BEAKS 24X-8B | 19800 |
| 2 | 2 | FBIR BEAKS 24X-8E | 23933 |
| 3 | 3 | FBIR BIRD 31X-19 | 19806 |
| 3 | 3 | FBIR BIRD 31X-19D | 23883 |
| 3 | 3 | FBIR BIRD 31X-19G | 23881 |
| 3 | 3 | FBIR BIRD 31X-19H | 23882 |
| 4 | 3 | FBIR STEPHEN 31X-19 | 19806 |
| 4 | 3 | FBIR STEPHEN 31X-19D | 23884 |
| 4 | 3 | FBIR STEPHEN 31X-19G | 24084 |
| 4 | 3 | FBIR STEPHEN 31X-19H | 23885 |
| 5 | 4 | FBIR BLACKMEDICINE 24X-21B | 20600 |
| 5 | 4 | FBIR BLACKMEDICINE 24X-21A | 32290 |
| 5 | 4 | FBIR BLACKMEDICINE 24X-21AXD | 32302 |
| 5 | 4 | FBIR BLACKMEDICINE 24X-21C | 32280 |
| 5 | 4 | FBIR BLACKMEDICINE 24X-21CXD | 32282 |
| 5 | 4 | FBIR BLACKMEDICINE 24X-21D | 32472 |
| 5 | 4 | FBIR BLACKMEDICINE 24X-21E | 32283 |
| 5 | 4 | FBIR BLACKMEDICINE 24X-21EXH | 32707 |
| 5 | 4 | FBIR BLACKMEDICINE 24X-21F | 32291 |
| 5 | 4 | FBIR BLACKMEDICINE 24X-21G | 32279 |
| 5 | 4 | FBIR BLACKMEDICINE 24X-21H | 32281 |
| 6 | 5 | FBIR DARCIE 34X-14 | 20114 |
| 6 | 5 | FBIR DARCIE 34X-14D | 24038 |
| 6 | 5 | FBIR DARCIE 34X-14H | 24037 |
| 7 | 6 | FBIR GEORGEBLACKHAWK 21X-6B | 20483 |
| 8 | 7 | FBIR GOESEVERYWHERE 31X-11C | 20417 |
| 9 | 8 | FBIR GRINNELL 34X-33C | 20419 |
| 9 | 8 | FBIR GRINNELL 34X-33A | 30773 |
| 9 | 8 | FBIR GRINNELL 34X-33B | 30771 |

| | | | |
|---|---|---|---|
| 9 | 8 | FBIR GRINNELL 34X-33D | 30768 |
| 9 | 8 | FBIR GRINNELL 34X-33E | 30772 |
| 9 | 8 | FBIR GRINNELL 34X-33F | 30770 |
| 9 | 8 | FBIR GRINNELL 34X-33G | 30769 |
| 10 | 9 | FBIR GRINNELL 41X-1C | 20424 |
| 11 | 10 | FBIR GUYBLACKHAWK 24X-27A | 26879 |
| 11 | 10 | FBIR GUYBLACKHAWK 24X-27B | 20215 |
| 11 | 10 | FBIR GUYBLACKHAWK 24X-27ER | 27443 |
| 11 | 10 | FBIR GUYBLACKHAWK 24X-27F | 26878 |
| 12 | 11 | FBIR HEADLESSTURTLE 44X-32C | 20273 |
| 13 | 12 | FBIR HUNTSALONG 31X-2 | 21120 |
| 14 | 2 | FBIR HUNTSMEDICINE 24X-8B | 19801 |
| 14 | 2 | FBIR HUNTSMEDICINE 24X-8E | 23693 |
| 15 | 13 | FBIR IRONWOMAN 21X-10 | 19948 |
| 15 | 13 | FBIR YELLOW WOLF 21X-10 | 19940 |
| 16 | 14 | FBIR LAWRENCE 24X-26B | 20143 |
| 17 | 15 | FBIR NELLIEOLDMOUSE 13X-13B | 20632 |
| 18 | 16 | FBIR SMITH 11X-10 | 20036 |
| 18 | 16 | FBIR SMITH 11X-10A | 23403 |
| 18 | 16 | FBIR SMITH 11X-10E | 23401 |
| 18 | 16 | FBIR SMITH 11X-10F | 23402 |
| 19 | 17 | FBIR WALTERPACKSWOLF 31X-12C | 19696 |
| 19 | 17 | FBIR WALTERPACKSWOLF 31X-12D | 24132 |
| 19 | 17 | FBIR WALTERPACKSWOLF 31X-12G | 24130 |
| 19 | 17 | FBIR WALTERPACKSWOLF 31X-12H | 24131 |
| 20 | 18 | FBIR YOUNGBEAR 31X-9A | 25430 |
| 20 | 18 | FBIR YOUNGBEAR 31X-9B | 20117 |
| 20 | 18 | FBIR YOUNGBEAR 31X-9E | 25431 |
| 20 | 18 | FBIR YOUNGBEAR 31X-9F | 25429 |
| 21 | 19 | Fettig #24-22H | 18766 |
| 22 | 20 | FBIR REESE 43X-33A | 31215 |
| 22 | 20 | FBIR REESE 43X-33B | 31217 |
| 22 | 20 | FBIR REESE 43X-33C | 31219 |
| 22 | 20 | FBIR REESE 43X-33D | 31221 |
| 22 | 20 | FBIR REESE 43X-33E | 31216 |
| 22 | 20 | FBIR REESE 43X-33F | 31218 |

| 22 | 20 | FBIR REESE 43X-33G | 31220 |

**APPENDIX B**

**Environmental Mitigation Project**

XTO shall comply with the requirements of this Appendix and with Section V (Environmental Mitigation Project) of the Consent Decree to implement and secure the environmental benefits of the Project described in this Appendix.

**I.  Project Plan**

A.  At least 30 days prior to the proposed date for project initiation, XTO shall submit a proposed plan (Project Plan) to EPA. The Project Plan is subject to review and approval by EPA, and such approval shall not be unreasonably withheld.

B.  The proposed Project Plan shall include the following:

1.  A plan for implementation of the Project;

2.  A summary-level budget for the Project;

3.  A timeline for implementation of the Project; and

4.  A summary of the anticipated environmental benefits of the Project.

C.  Upon approval by EPA of the Project Plan required by this Appendix, XTO shall complete the approved Project according to the approved Project Plan. Nothing in the Consent Decree shall be interpreted to prohibit XTO from completing the Project ahead of the schedule approved in the Project Plan.

D.  Nothing in this Appendix shall relieve XTO of its obligation to comply with all applicable federal, state, and local laws and regulations, including, but not limited to, any obligations to obtain any permits pursuant to the Clean Air Act in implementing the Project Plan.

**II.  Storage Tank Auto-Gauging/Use of LACT Truck – Thief Hatch Usage Reduction**

A.  XTO shall (1) equip all tank systems identified on Attachment 1 to this Appendix B with auto-gauging equipment and (2) for each storage tank at a tank system identified on Attachment 1 to this Appendix B that is unloaded by truck, use a truck equipped with a mobile LACT unit so as to reduce or eliminate the need for opening the thief hatch on a storage tank for tank gauging and/or unloading at such tank systems by December 31, 2018. XTO may request from EPA, and EPA's approval shall not be unreasonably withheld, an extension of the timeframe prescribed by this paragraph if XTO informs EPA it will be unable to complete installation of the auto-gauging equipment and/or begin use of the LACT truck in the required timeframe due to unforeseen circumstances outside of XTO's control.

1

B.  XTO shall (1) install and continue to operate such auto-gauging equipment at all tank systems subject to this Appendix B and (2) use a LACT truck for tank truck loadout at all tank systems subject to this Appendix B, eliminating the opening of thief hatches to the extent practicable (which could include possible modifications to lease agreements that require use of API Method 18.1 or Bureau of Land Management (BLM) approvals for custody transfer), until the joint stipulation terminating the Consent Decree is entered by the court. If XTO needs to replace a specific tank system included on Attachment 1 at any time, XTO may submit a proposal to EPA to replace the specific tank system with another tank system providing comparable or greater environmental benefits, and such approval shall not be unreasonably withheld.

C.  XTO estimates that it will cost at least $615,000 to equip the tank systems on Attachment 1 with auto-gauging equipment and to use a LACT truck during tank truck loadout. Consistent with Paragraph 18 of the Consent Decree, XTO shall use its best efforts to secure as much environmental benefit as possible for the Project. In the Project Plan, as part of the information required to be provided under Paragraph I.B. (above), XTO shall specify the equipment to be installed and provide a description of the protocols and procedures to be implemented using such equipment.

D.  Reporting Requirements: XTO's reporting requirements for this Project under Paragraph 26.g of the Consent Decree shall be satisfied by:

1.  Identification of the tank systems at which tank auto-gauging equipment has been installed in the next Semi-Annual Report submitted after the auto-gauging equipment has been installed at a particular tank system;

2.  Photographs of the equipment installed at each tank system;

3.  For truck loadouts conducted during the period covered by the Semi-Annual Report, a list of each LACT truck loadout for each tank system;

4.  For truck loadouts conducted during the period covered by the Semi-Annual Report, provide a summary of expenditures for XTO's contracts for use of LACT trucks;

5.  For those tank systems at which tank auto-gauging equipment has been installed during the period covered by the Semi-Annual Report, provide a summary of expenditures; and

6.  Provide a description of measures taken to ensure XTO personnel are implementing tank auto-gauging, along with a description of the

methods and any challenges encountered during the period covered by
the Semi-Annual Report.

## Attachment 1 to Appendix B

| Number | Pad Name | Latitude | Longitude |
|--------|----------|----------|-----------|
| 1 | Alwin & Elaine Federal 12X-19 | 47.62749 | -102.96692 |
| 2 | Bang 31X-29 | 47.3565 | -102.808 |
| 3 | BCU 27-1 | 47.6001 | -102.893 |
| 4 | Beckert 24-7 | 47.3877 | -102.709 |
| 5 | Fettig 24-22 | 47.7035 | -102.701 |
| 6 | Franchuk 24X-19 | 47.3589 | -102.835 |
| 7 | Franchuk 24X-20 | 47.3591 | -102.815 |
| 8 | Franchuk 34-19 | 47.3585 | -102.804 |
| 9 | Franchuk 44-20 | 47.3585 | -102.804 |
| 10 | Gilbertson 11-26 | 48.0519 | -102.866 |
| 11 | Gilbertson 34-26 | 48.0389 | -102.855 |
| 12 | Granli 34X-20 | 47.791325 | -103.506808 |
| 13 | Hanson 11X-12 | 47.3129 | -102.794 |
| 14 | Johnson 43X-27 | 47.349 | -102.762 |
| 15 | Kulish 21-11 | 47.3118 | -102.81 |
| 16 | Kulish 24-2 | 47.3143 | -102.81 |
| 17 | Lawlar 41-15 | 47.905053 | -103.328925 |
| 18 | Martin Federal 31X-33H | 47.6026 | -102.918 |
| 19 | Nelson Federal | 48.0225 | -102.743 |
| 20 | Rogne 11-35 | 47.3421 | -102.757 |
| 21 | Rogne 44-34 | 47.3293 | -102.76 |

| 22 | Sadowsky 44-1 | 47.3153 | -102.78 |
| 23 | Schwindt 31-10 | 47.3127 | -102.83 |
| 24 | Strommen 44X-7 | 47.3879 | -102.7 |
| 25 | Thompson 44X-20 | 47.7909 | -102.857 |
| 26 | Truchan 11X-33 | 47.3422 | -102.795 |
| 27 | Van Dyke Federal 44X-19 | 47.7055 | -102.878 |
| 28 | Walton Federal 41X-19 | 47.7165 | -102.878 |
| 29 | Marlene 42X-20 North Pad | 47.7995 | -102.857 |
| 30 | Marlene 42X-20 South Pad | 47.798 | -102.856 |
| 31 | Thompson Federal 41X-17 | 48.447539 | -102.5510301 |
| 32 | State 11 | 48.446558 | -102.5446145 |